## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**ECAPITAL CORP.,**

**Plaintiff,**                                               **Case No.**

**V.**

**THE     GLOBAL     LOGISTICS
SOLUTIONS GROUP, LLC,**

**Defendant.**

---

## COMPLAINT

Plaintiff, ECAPITAL CORP., sues Defendant, THE GLOBAL LOGISTICS SOLUTIONS

GROUP, LLC, and further states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      This is an action for damages arising out of a claim for breach of contract. The

parties are of different states and the amount at issue exceeds $75,000.00, exclusive of interest,

costs and attorneys' fees.

2.      Plaintiff, ECAPITAL CORP. ("Plaintiff"), is a Florida corporation.

3.      Defendant, THE GLOBAL LOGISTICS SOLUTIONS GROUP, LLC

("Defendant"), is a California limited liability company.

4.      This Court possesses jurisdiction over this action under 28 U.S.C. § 1332(a)

because complete diversity of citizenship exists among the parties and because the amount in

controversy exceeds $75,000.00, exclusive of interest, costs, and attorney's fees.

5.     Venue in the Southern District of Florida accords with 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Florida.

6.     All conditions precedent to the filing of this action have occurred.

## **GENERAL ALLEGATIONS**

7.     Plaintiff is in the factoring business, which involves the purchase of accounts receivable at a discount from businesses. In factoring, the entity that purchases the accounts is known as the "Factor." The entity from whom the Factor purchases the accounts is the "Factoring Client." The Factoring Client's customer, who owes payment on the account, is an "Account Debtor."

8.     As a Factor, Plaintiff advances funds to its Factoring Clients by purchasing the Factoring Client's accounts. To assist in collecting those accounts, Plaintiff provides remittance instructions to the Factoring Client's customers (*i.e.*, its Account Debtors). The instructions tell the Account Debtors that the Factoring Client's accounts have been assigned to Plaintiff for payment and that all obligations owed to the Factoring Client are to be paid directly to Plaintiff. Regarding the accounts that Plaintiff has purchased, the Factoring Client does not retain any legal or equitable interest in the accounts it sold. All legal and equitable interests in the sold accounts, including the exclusive right to receive payment from the Account Debtor, vest with Plaintiff.

## **Factoring Agreement with The Global Logistics Solution Group LLC**

9.     On or about March 9, 2018, Plaintiff and Defendant entered into a written Factoring Master Agreement, which incorporated by reference the Factoring Agreement Terms and Conditions, a copy of which was provided to Defendant and is also published at terms.ecapital.com (collectively, the "Factoring Agreement") whereby, among other things, Plaintiff agreed to

purchase eligible accounts from Defendant under an agreed-upon formula. A true and correct copy of the Factoring Agreement is annexed as **Exhibit A**.

10.     Plaintiff is informed and believes that Defendant was in the business of providing transportation and freight and logistic services to clients.  As a Factor, Plaintiff purchased accounts from Defendant arising from the services that Defendant rendered for its customers.  Defendant did not retain any legal or equitable interest in the accounts that it sold to Plaintiff.

## Count I: Breach of Contract

11.     Plaintiff incorporates paragraphs 1-10 as if fully set forth herein.

12.     The Factoring Agreement with Defendant constitutes a valid and binding contract.

13.     Plaintiff performed under the Factoring Agreement by delivering funds to Defendant pursuant to the terms of the Factoring Agreement.

14.     Defendant breached the Factoring Agreement by, among other things:

    a.   failing to pay amounts when due;

    b.   suspending or discontinuing its business; and

    c.   guarantor becoming subject to debtor-relief proceedings by filing for relief under Chapter 7 of the United States Bankruptcy Code.

15.     The aforementioned actions or inactions each constitute an Event of Default as defined in Section 12.1 of the Factoring Agreement Terms and Conditions.

16.     By virtue of the Events of Default, Plaintiff terminated the Factoring Agreement and all obligations and amounts became immediately due and payable without notice in accordance with Sections 12.2, 12.3, and 13.3 of the Factoring Agreement Terms and Conditions.

17.     The aforementioned actions or inactions constitute a breach of contract, and Plaintiff has incurred actual damages of at least $299,258.98, together with default rate, pre-

judgment and post-judgment interest, fees, charges, expenses, attorneys' fees, and court costs, as a result of Defendant's breach.

18.     Pursuant to the express terms of the Factoring Agreement, including section 17 of the Factoring Agreement Terms and Conditions incorporated therein, Plaintiff is entitled to recover its attorneys' fees and court costs incurred in connection with this action and in enforcing the Factoring Agreement.

WHEREFORE, Plaintiff, ECAPITAL CORP., respectfully demands that judgment be entered in its favor against Defendant, THE GLOBAL LOGISTICS SOLUTIONS GROUP, LLC, for the damages, including all default rate, pre-judgment and post-judgment interest, fees, charges, expenses, attorneys' fees, court costs, and such other and further relief to which the Plaintiff may be entitled at law or in equity, whether pled or unpled.

*/s/ Edwin G. Rice*
Edwin G. Rice
Florida Bar No. 855944
Primary E-Mail: erice@bradley.com
Secondary E-Mail: ddecker@bradley.com
E. Tyler Samsing
Florida Bar No. 28380
Primary E-Mail:  tsamsing@bradley.com
Secondary E-Mail: ddecker@bradley.com
**BRADLEY ARANT**
**BOULT CUMMINGS LLP**
100 N. Tampa Street, Suite 2200
Tampa, FL 33602
T: (813) 559-5500 | F: (813) 229-5946





Transportation
**EXPRESS SIGN UP** SECTION **A**
AND FACTORING MASTER AGREEMENT

Jorge Martinez
(760) 456-3573

## STEP 1: ABOUT YOUR BUSINESS

SELLER: The Global Logistics Solutions Group, LLC

OTHER TRADE NAMES AND DBAs: _____

US DOT#: 3105853  MC#: 080075  EMAIL: jhectorflores33@gmail.com

PHONE: (619) 929-2127  FAX: (619) 929-2127  OFFICE MANAGER: _____

BUSINESS ADDRESS: 2620 Noble Canyon Rd  CITY: Chula Vista  STATE: CA  ZIP: 91915

☐ CORPORATION  ☐ LLC  ☐ INDIVIDUAL  ☐ PARTNERSHIP  FORMED IN WHICH STATE? _____ YEARS IN BUSINESS? _____

COMPANY TRUCKS: # OWNED: 2  # LEASED: _____ # TRAILERS: _____ # OF OWNER OPERATORS LEASED ON: _____

CHECK ALL THAT APPLY: ☐ BACK TAXES ☐ JUDGMENTS & LIENS ☐ LAWSUITS ☐ CRIMINAL CONVICTIONS  EXPLAIN: _____

YEARS IN TRANSPORTATION INDUSTRY: _____ TYPE OF EXPERIENCE: _____

DESCRIBE YOUR GROWTH PLANS: _____

I AM ALSO INTERESTED IN: ☐ THE eCAPITAL FUEL CARD  ☐ TRUCK/TRAILER LEASE PROGRAM  ☐ FUEL ADVANCES

## STEP 2: ABOUT YOUR ACCOUNTS RECEIVABLE

AMOUNT YOU INTEND TO FACTOR MONTHLY: $ 25,000.00  HOW SOON DO YOU INTEND TO START FACTORING? _____

HAVE YOU OR ANY OWNER EVER FACTORED OR BORROWED AGAINST YOUR RECEIVABLES? ☐ NO ☐ YES  WITH WHOM? _____

ARE YOU CURRENTLY IN A FACTORING RELATIONSHIP? ☐ NO ☐ YES  WITH WHOM? _____

DO YOU HAVE A WORKING CAPITAL ADVANCE OR LOAN? ☐ NO ☐ YES  WITH WHOM? _____ BALANCE? _____

**Factoring Master Agreement**
This Factoring Master Agreement is made between eCapital LLC, located at PO Box 96267, Las Vegas, NV 89193-6267 ("Purchaser"), and Seller (as specified herein), and incorporates by reference the Factoring Agreement Terms and Conditions ref# e03 (the "Terms and Conditions"), a copy of which has been provided to Seller and is also published at terms.eCapital.com, as if the Terms and Conditions are fully set forth herein. The factoring rates specified in Section B shall apply to this agreement. By Seller's signature below, Seller acknowledges and agrees that Seller has read the Terms and Conditions, and agrees that said Terms and Conditions shall bind Seller as if fully incorporated herein, and supersede any prior agreements or understandings between Purchaser and Seller. Purchaser inter alia agrees (a) to the Termination provisions therein, (b) to grant a continuing first priority security interest in and to the Collateral (which shall include Seller's accounts) to secure the Seller's Obligations to Purchaser, and (c) that Purchaser is authorized to file an initial financing statement consistent with Article 9 of the Uniform Commercial Code. Where applicable, terms used herein and not otherwise defined shall have the meanings defined in the Terms and Conditions.
I/we hereby attest that all information provided is true and correct to the best of my/our knowledge, and is given to induce eCapital LLC to enter into this factoring relationship with the Applicant/s. I/we do hereby authorize eCapital LLC and/or its agent/affiliates to verify and investigate at any time the information provided including the obtaining of consumer and other credit reports.
**Guaranty:** The Guarantor(s) unconditionally and irrevocably guarantee(s) to Purchaser the prompt performance in full of all obligations, indebtedness, and liabilities of Seller of every kind and character owed to Purchaser. The obligations of Guarantor hereunder are direct and primary and are independent of the obligations of Seller or any other guarantor(s).

## STEP 3: OWNERSHIP: PLEASE ACCOUNT FOR 100%

|  | OWNER 1 & GUARANTOR | OWNER 2 & GUARANTOR | OWNER 3 & GUARANTOR |
|---|---|---|---|
| OWNER NAME | Hector Flores | | |
| TITLE | CEO | | |
| HOME ADDRESS | 2620 Noble Canyon Rd | | |
| CITY, STATE, ZIP | Chula Vista CA 91915 | | |
| CELL PHONE | 619-929-2127 | | |
| SS# | 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 | | |
| DOB | 3-13-69 | | |
| % OWNED | 100% | | |
| SIGNATURE | SIGN: [signature]  DATE: 3-12-18 | SIGN:  DATE: | SIGN:  DATE: |

| eCAPITAL USE ONLY | | | |
| Purchaser: eCapital LLC  Place of acceptance: Las Vegas, NV | Date of acceptance: _____ | By: _____ Authorized signor | Title: _____ |

eCapital 2017 ©

**EXHIBIT A**

 **Hello** cash flow.

SUBMIT YOUR INFO › WE VERIFY › YOU GET CASH



## YOUR CUSTOMIZED RATES

**SELLER:** The Global Logistics Solutions Group, LLC
DOT # 3105853

**Receivable Finance Facility: $100,000**
*For higher facilities, additional documentation is required.*

| | |
|---|---|
| **ADVANCE/RESERVE %** | 95 % / 5 % |
| **ADMINISTRATIVE FEE % (PER TABLE)** | Flexible, calculated on prior month's total purchased accounts |
| **SELLING TERM** | 35 days |
| **SERVICE CHARGE %** | Flexible, calculated on prior month's total purchased accounts |
| **SERVICE CHARGE PERIOD** | 25 days |
| **MINIMUM MONTHLY FEE** | $0 |
| **PROJECTED MONTHLY VOLUME** | $25,000 |
| **LATE PAYMENT DATE PERIOD** | 60 days |
| **DOCUMENTATION FEE** (TAKEN FROM INITIAL FUNDING) | $150 |
| **RELATIONSHIP PERIOD** | 90 days |

| DOLLAR VOLUME OF MONTHLY ACCOUNTS PURCHASED | ADMIN FEE % 1 - 35 Days | SERVICE CHARGE % Each 25 Days Until Day 60 |
|---|---|---|
| Under - $20,000 | 2.95 % | 1.50 % |
| * $20,001 - $50,000 | 2.75 % | 1.00 % |
| $50,001 - $75,000 | 2.50 % | 1.00 % |
| $75,001 - $125,000 | 2.25 % | 0.75 % |
| $125,001+ | 2.00 % | 0.50 % |

*Starting tier*

**AS UTILIZED FEES**

Invoice Processing Fee: $1 per invoice; Wires: $15; ACH: $0; Money Code: $10; Check by Mail: $10, eCapital Fuel Card: $0

**Non-Recourse Credit Guarantee Fee - *Please check one.***
☐ Accept  (+0.5%)   ☒ Decline

## UNDERSTANDING YOUR RATE TABLE

We strive to be transparent in our fees and charges! Please review with your Factoring Consultant.

- **No haggle guarantee:** We recognize the value of your growing business, and automatically reward you with our lowest rates according to your monthly factoring volume. No haggling; the more you factor the lower your rates!
- **Dollar Volume of Monthly Accounts Purchased:** This means the total amount of invoices we purchased from you in a particular month.
- **Flexible fees:** The more you factor, the lower your fees- automatically. The fees that apply to new invoices purchased by us in each month are based on the total invoices we purchased in the preceding month, as set out in the table. Rate adjustments are assessed within 5 days of each month end and will apply to subsequent invoices purchased. (Note: for each invoice purchased, the rate structure that applies to that particular invoice is set at the time we fund it, and does not change regardless of when payment is received by us.)
- **Starting tier:** When you begin factoring, the rates in the Starting tier (designated with*) will apply for at least 60 days.
- **Your fees:** We charge an Admin Fee and (if applicable) a Service Charge depending on when we receive payment for your invoices. After the "Late Payment Date Period", your invoices are considered "late".
- **As utilized fees:** As listed above.
- **Relationship Period:** Our Relationship Period allows you to try our program for 90 days and make sure it fits with your business needs. To cancel, submit a written notice within 30 days of your first funded invoice.
- **Non-Recourse Credit Guarantee:** Non-Recourse Credit Guarantee ensures your company is not held liable for non-payment in the event your credit approved Account Debtor (broker) becomes insolvent. 0.5% additional fee will apply.

## NEXT STEPS

In order to expedite set up of your account, please do the following:
☐ Ensure full completion of section A
☐ Take a photo of each owner's drivers license
☐ Scan or take a photo of a voided check for your business
☐ Certificate of Insurance
☐ Gather aging report and customer list (if applicable)

**OWNER INITIAL HERE** HF   Date: 3-12-18

## SEND ALL ITEMS LISTED ABOVE TO:

Email: signup@ecapital.com
OR Fax: 760.929.6920

**TERMS & CONDITIONS**
**(As published at terms.eCapital.com)**

REF #E01, #E02, #E03, #B-02, #B-e01, #005, #004, #003, #e01, #e02, #e03

The following are the Factoring Agreement Terms and Conditions (Terms and Conditions) that are incorporated by reference in the Factoring Master Agreement between eCapital Freight Factoring Corp., ("Purchaser") and Seller. Capitalized terms not herein defined shall have the meaning set forth in the Factoring Master Agreement and vice versa. All other capitalized terms not otherwise defined shall have the meaning set forth in the Uniform Commercial Code.

1. Definitions. The following terms used herein and in the Factoring Master Agreement shall have the following meaning:

"Account/s"– Means all currently existing and hereafter arising accounts, contract rights, and all other forms of obligations owing to Seller arising out of the sale or lease of goods or the rendition of services by Seller irrespective of whether earned by performance, and any and all credit insurance, guaranties, or security therefor.

"Account Debtor" – The obligor on an Account.

"Accounts Transmittal Form" – A form that may be supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

"Accounts Transmittal Upload" – A transmission initiated by Seller of images or digital information in a form required by Purchaser, listing such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

"Accounts Transmittal" – An Accounts Transmittal Form or an Accounts Transmittal Upload, as applicable.

"Administrative Fee" – The Administrative Fee Percent or Administrative Fee % specified in the Factoring Master Agreement multiplied by the stated Face Amount of a Purchased Account at the time of purchase by Purchaser.

"Advance Fee" – Fee paid by Seller to Purchaser for receipt of a Fuel Advance under the Fuel Advance Program.

"Advance Percentage" or "Advance %" – The percentage specified in the Factoring Master Agreement multiplied by the Face Amount of each Purchased Account. The percentage may vary on Accounts owed by different Account Debtors. Upon any Event of Default, Purchaser may change the Advance Percentage as it deems necessary, in its sole discretion.

"Affiliate of Seller" – Any Person (other than Purchaser): (i) directly or indirectly controlling, controlled by, or under common control with, Seller; (ii) directly or indirectly owning or holding five percent (5%) or more of any equity interest in Seller; or (iii) five percent (5%) or more of whose voting stock or other equity interest is directly or indirectly owned or held by Seller.  For purposes of this definition, "control" (including the correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the power, directly or indirectly, to determine management and policies of a Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" – The Factoring Master Agreement, incorporating these Terms and Conditions, and any extensions, riders, supplements, amendments, or modifications thereto or in connection therewith.

"Avoidance Claim" – Any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute, other than claims which relate solely to Non-Recourse Accounts, if any.

"Clearance Days" – Three (3) business days.

"Clearance Day Payments" – Payments received by Purchaser in whatever form and from whatever source, in reduction of the Obligations.

"Client Profile" – Any application submitted by Seller setting forth details regarding Seller's business.

"Closed" – A Purchased Account is closed upon the first to occur of (i) receipt by Purchaser of full payment; (ii) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof.  The closure of any Purchased Account by Purchaser shall not be construed so as to relieve Seller of any of its Obligations provided herein.  Seller shall not be deemed to have satisfied its repurchase obligation if a Reserve Shortfall exists.

"Closing Date" – The later of (i) the date on which Seller executes this Agreement; or (ii) the initial Purchase Date under the Factoring Master Agreement.  Purchaser's payment of the Purchase Price on any Account shall be deemed Purchaser's acceptance and performance of the Factoring Master Agreement, notwithstanding Purchaser not executing the Factoring Master Agreement.

"Collateral" – All now owned and hereafter acquired personal property and fixtures, and proceeds thereof, (including proceeds of proceeds) including without limitation Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles.

"Date of Acceptance" or "DOA" – means the date upon which any Addendum stating revised terms to the Agreement is signed by the Parties, and if unsigned by Purchaser, the date upon which Purchaser updates its systems to give effect to such revised terms, which shall apply to all subsequently purchased invoices.

"Depository" – As specified by Seller on the Funding Transfer Instructions form provided by Purchaser, or any demand deposit account maintained by Seller or any Guarantor or represented by an employee of Seller to be maintained by Seller, or any other account of Seller, including fuel card accounts, into which Seller directs Purchaser to make advances or payments of any obligations owed to Seller by Purchaser pursuant to the terms hereof.

"Default Rate" – One and one-half percent (1.5%) for each ten (10) days, commencing on the date any Event of Default first occurs.

"Eligible Account" – An Account that is acceptable for purchase as determined by Purchaser in the exercise of its sole credit or business judgment.

"Email/Fax Submission" – An Invoice and/or associated documents provided by Seller to Purchaser pursuant to the Email/Fax Submission Program via an electronically transmitted image in advance of the provision of an original Invoice representing a corresponding Account.

"Email/Fax Submission Program" – Purchaser may accept images of Invoices and associated paperwork/backup documents submitted by Seller via email and/or fax as evidence of an Eligible Account at Purchaser's sole discretion subject to the following requirements and limitations: (i) only Invoices for completed services and/or delivered services are eligible for submission; (ii) Invoice and associated paperwork/backup documents must be received by 11AM Eastern Daylight Time to be eligible for next business day funding; (iii) images may include the following and be in order as follows: Accounts Transmittal, Invoice), rate confirmation, signed bill of lading or other proof of delivery, any other applicable documents such as lumper receipts or scale tickets; (iv) a late penalty of two hundred dollars ($200) shall be due from Seller to Purchaser for each Purchased Account submitted via email or fax for which Purchaser has not received original documents within ten (10) days of purchase of said Purchased Account(s); (v) Seller's eligibility to submit Accounts for purchase by Purchaser via email and/or fax is at the sole discretion of Purchaser and may be revoked by Purchaser at any time.

"Exposed Payments" – Payments received by Purchaser from an Account Debtor that has become subject to a bankruptcy proceeding, to the extent such payments cleared said Account Debtor's deposit account within ninety (90) days of the commencement of said bankruptcy case.

"Face Amount" – The face amount due on an Account.

"Factoring Master Agreement" – The Factoring Master Agreement by and between the Parties.

"Finance Application" – Any application (including, but not limited to the Client Profile) submitted by Seller to Purchaser for the purpose of procuring financing from Purchaser, together with any supporting information provided by Seller to Purchaser in connection therewith.

"Fuel Advance" – Funds advanced to Seller by Purchaser pursuant to the Fuel Advance Program against future Accounts that have yet to be assigned an Invoice and are not yet Eligible Accounts.

"Fuel Advance Program" – Fuel Advances may be made to Seller at Purchaser's sole discretion subject to the following requirements and limitations: (i) maximum Fuel Advance amount of the lower of fifty percent (50%) of the Face Value of the future Account or three thousand dollars ($3,000); (ii) goods to be delivered associated with the future Account must be loaded on to the Seller's truck but not yet delivered; (iii) the Account Debtor on the future Account has been credit approved by Purchaser; (iv) a late penalty of one tenth of a percent (.1%) per diem shall accrue on the Face Value of the entire Future Account for which an original Invoice sufficient to evidence an Eligible Account has not been provided by Seller to Purchaser within ten (10) days of the provision of the Fuel Advance by Purchaser to Seller; (v) no other advance may be taken by Seller from any other party on a future Account for which Purchaser has made or will make a Fuel Advance; (vi) any checks or payments of any kind received by Seller on a future Account for which Purchaser has made a Fuel Advance must be forwarded to Purchaser without first being deposited or otherwise encashed; (vii) Seller's eligibility to receive Fuel Advances may be revoked at the sole discretion of Purchaser at any time; (viii) the maximum number of Fuel Advances the Seller may receive in any given time period under the Fuel Advance Program is determined at the sole discretion of Purchaser and may be changed by Purchaser at any time; (ix) Seller shall pay an Advance Fee to Purchaser on each future Account for which Purchaser makes a Fuel Advance in addition to, at the discretion of Purchaser, expenses (both out-of-pocket expenses and allocated internal costs) incurred by Purchaser in connection with the transfer of the Fuel Advance to Seller.

"Funding Transfer Instructions" – A form provided by Purchaser and submitted by Seller indicating Seller's chosen method of transfer of funds owed to Seller by Purchaser pursuant to the terms hereof.

"Insolvent" – An Account Debtor has become Insolvent if it is the subject of (i) a petition under any state or federal debtor relief or liquidation statute filed within the Insolvency Period, or (ii) a proceeding under Chapters 11 or 13 of the Bankruptcy Code filed on or before the Purchase Date, the conversion of said case to or under Chapter 7 thereunder within the Insolvency Period.

"Insolvency Period" – The earlier of (i) the Late Payment Date or (ii) the date on which the Seller could be required to repurchase an account under the section hereof entitled "Repurchase of Accounts."

"Invoice" – The document that evidences or is intended to evidence an Account.  Where the context so requires, references to an Invoice shall be deemed to refer to the Account to which it relates.

"Invoice Date" – The date of creation of an Invoice, which shall be no earlier than the date of Account completion, recorded thereupon.

"Late Charge" – One and one-half percent (1.5%) for each ten (10) days computed from the Late Payment Date; provided, however, that any Late Charge with respect to any Reserve Shortfall shall be computed from the date such Reserve Shortfall occurred.

"Late Invoice Date" – The date which is the last day of the Late Payment Date period specified in the Factoring Master Agreement, computed from the Invoice Date.

"Late Payment Date" – The date which is the last day of the Late Payment Date period specified in the Factoring Master Agreement, computed from the Purchase Date.

"Misdirected Payment Fee" – Fifteen percent (15%) for the first event, (increasing by 10% for each subsequent event) of the amount of any payment on account of a Purchased Account (a) which has been received by Seller and not delivered in kind to Purchaser on the next banking day following the date of receipt by Seller, or (b) which Seller has attempted directly or indirectly to divert from direct payment to Purchaser's address.

"Non-Recourse Account" – A Purchased Account other than a Recourse Account.

"Non-Recourse Credit Guarantee" – Means the assumption by Purchaser of the risk of non-payment on certain Purchased Accounts identified by Purchaser, provided the cause of non-payment is solely due to an Account Debtor becoming Insolvent subject further to the provisions of Section 2.

"Non-Recourse Credit Guarantee Fee"- A fee due to Purchaser for the provision of the Non-Recourse Credit Guarantee where applicable.

"Obligations" – All present and future obligations of Seller to Purchaser and/or Purchaser's Affiliates whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, whether arising before, during or after the commencement of any Bankruptcy Case in which Seller is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations; and all principal, interest, fees, charges, expenses, attorneys' fees chargeable to Seller or incurred by Purchaser in connection with this Agreement.

"Parties" – Seller and Purchaser specified in the Factoring Master Agreement.

"Payments" – Payments received by Purchaser, in whatever form and from whatever source, in reduction of the Obligations.

"Person" – Means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

"Projected Volume" – The dollar volume of monthly Accounts specified in the Factoring Master Agreement that will be factored corresponding to the fee structure provided hereunder. If the Administrative Fee Percent is not indicated as Variable or Flexible on the Factoring Master Agreement, and such dollar volume of monthly Accounts is not achieved for any consecutive period of 60 days, the Administrative Fee Percent may thereafter be automatically increased by up to 2 percentage points (e.g. an Administrative Fee Percent of 0.5% may be increased to 2.5%).

"Purchase Date" – The date upon which an account has been deemed to have been purchased as set forth in Section 2.1.7 herein.

"Purchase Price" – The Face Amount, less (a) duplication, discounts, returns, credits or allowances of any nature at any time issued, owing, granted or outstanding, and (b) the Administrative Fee.

"Purchase Summary Report" – Means a report prepared by Purchaser, which may occur upon receipt of an Accounts Transmittal, indicating those accounts of Seller that Purchaser intends to purchase.

"Purchased Accounts" – Accounts purchased hereunder which have not been Repurchased.

"Purchaser's Affiliates" – With respect to Purchaser, any affiliated or subsidiary companies, entities, members, owners, joint venturers, and Purchaser's managers, directors, officers, employees or agent and representatives.

"Receivable Finance Facility" – The amount specified in the Factoring Master Agreement.

"Recourse Accounts" – See Section 2.1.2.

"Relationship Period" – Means the period as may be specified in the Factoring Master Agreement determined from the Closing Date.

"Repurchased" – An Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount, together with any unpaid fees relating to the Purchased Account, upon demand by Purchaser under the terms hereof.

"Required Reserve Amount" – The Reserve Percentage multiplied by the balance of Purchased Accounts.

"Reserve Account" – A bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" or "Reserve %" – The percentage specified in the Factoring Master Agreement, provided, that Purchaser may, in its sole discretion, from time to time increase the Reserve Percentage to the extent that Purchaser determines that: (a) the dilution with respect to the Accounts for any period has increased in any material respect or may be reasonably anticipated to increase in any material respect above historical levels, (b) the general creditworthiness of Account Debtors has declined, or (c) Seller has failed to comply with the Terms and Conditions.  At Purchaser's sole discretion, the Reserve Percentage may vary on Accounts owed by different Account Debtors.

"Reserve Release Period" – Monthly, unless otherwise specified in the Factoring Master Agreement.

"Reserve Shortfall" – The amount by which the Reserve Account is less than the Required Reserve Amount.

"Selling Term'' – The number of days specified in the Factoring Master Agreement, computed from the Purchase Date.

"Service Charge" – The Service Charge Percent or Service Charge % specified in the Factoring Master Agreement, multiplied by the stated Face Amount of a Purchased Account at the time of purchase by Purchaser, for each Service Charge Period specified in the Factoring Master Agreement, or portion thereof that all or any portion thereof remains unpaid, computed from the end of the Selling Term.

"Term" – Means either the Relationship Period or any Renewal Term or Subsequent Term of this Agreement

"30-day Notice Window" or "Notice Window" – Means a 30-day period determined from the end of any Term of this Agreement.

2. Sale; Purchase Price; Billing; Reserve.

2.1 Assignment and Sale.

IF THE NON-RECOURSE CREDIT GUARANTEE OPTION IS "ACCEPTED" OR "INCLUDED" ON THE FACTORING MASTER AGREEMENT, THEN WITH RESPECT TO THE REST OF THIS SECTION 2, THE FOLLOWING PARAGRAPHS 2.1.1, 2.1.2, AND 2.1.4 – 2.1.8 SHALL APPLY:

2.1.1 From time to time, Seller may transmit to Purchaser a list of Seller's Accounts by Accounts Transmittal. Purchaser may thereafter provide to Seller a Purchase Summary Report based on such Accounts Transmittal, and Seller shall sell to Purchaser, as absolute owner, such of Seller's Accounts as are listed on such Purchase Summary Report. Upon purchase, and subject to any obligation by Purchaser to repurchase such Account as provided in Section (4), Purchaser will assume the risk of non-payment on such Purchased Accounts not to exceed the Covered Amount, provided: (i) the cause of non-payment is solely due to an Account Debtor becoming Insolvent prior to the Late Payment Date and, (ii) the Account Debtor is not an Affiliate of Seller, and (iii) Seller has obtained a credit approval for the Account Debtor in the eCapital credit database prior to the load being hauled that is within the approved credit limit, and (iv) Seller has provided all original backup documentation relating to the unpaid Purchased Account (to include but not limited to rate sheets, delivery notices and properly signed bills of lading) within 7 days of such a request being made by Purchaser to Seller. "Covered Amount" means as to any single Account Debtor, any amount in excess of $400 but not to exceed $5,000 per Invoice, and not to exceed in total $15,000 for all sums due to Purchaser by such Account Debtor.

2.1.2 Notwithstanding the foregoing, Purchaser may also from time to time purchase Accounts from Seller with full recourse to Seller ("Recourse Accounts").  Such Accounts shall be listed on a Purchase Summary Report indicating those Accounts that are being purchased as Recourse Accounts.

IF THE NON-RECOURSE CREDIT GUARANTEE OPTION IS NOT OFFERED, OR IS DECLINED OR N/A ON THE FACTORING MASTER AGREEMENT, THEN WITH RESPECT TO THE REST OF THIS SECTION 2, THE FOLLOWING PARAGRAPHS 2.1.3-2.1.8 SHALL APPLY:

2.1.3 From time to time, Seller may transmit to Purchaser a list of Seller's Accounts by Accounts Transmittal.  Purchaser may send to Seller a Purchase Summary Report based on such Accounts Transmittal, and Seller shall sell to Purchaser, as absolute owner, with full recourse, such of Seller's Accounts as are listed on such Purchase Summary Report.

2.1.4 Each Accounts Transmittal shall be accompanied by such documentation supporting and evidencing the Account, as Purchaser shall from time to time request.

2.1.5 Purchaser may in the exercise of its sole discretion purchase from Seller such Accounts as Purchaser determines to be an Eligible Account, so long as the total outstanding Face Amount of Purchased Accounts does not exceed, before and after such purchase, the Receivable Finance Facility.  Purchaser may, in Purchaser's sole credit judgment exercised in good faith, either increase or decrease the Receivable Finance Facility.   To the extent Purchaser's purchase of any Purchased Account shall cause the total outstanding Face Amount of Purchased Accounts to exceed the Receivable Finance Facility, the then existing Receivable Finance Facility shall, as of the date of such purchase, be automatically increased by an amount equal to the amount by which the total outstanding Face Amount of Purchased Accounts exceeds the Receivable Finance Facility as a result of such purchase.

2.1.6 All parties hereto agree than an Account with Invoice Date thirty (30) or more days prior to the then current date shall not be considered an Eligible Account.  Notwithstanding the foregoing, Purchaser may in the exercise of its sole discretion determine that an Account with Invoice Date thirty (30) or more days prior to the then current date shall be an Eligible Account.

2.1.7 Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Seller, including, without limitation, any amounts due under Section 2.3.2 hereof, of any Purchased Account to Seller's Depository within three business days of Purchaser's decision to purchase the Accounts, whereupon the Accounts shall be deemed purchased hereunder.

2.1.8 Purchaser may instruct each Account Debtor to remit all payments due under the related Account to Purchaser provided, that any Account Debtor may be permitted to pay all payments by the automatic debit of its account through the Automatic Clearing House System for payment to an account of Purchaser.

2.2 Notification and Billing. Purchaser may send a statement to any or all Account Debtors itemizing their account activity.  All Account Debtors will be instructed to make payments to Purchaser.

2.3 Reserve Account.

2.3.1 Upon the Reserve Release Period, Purchaser may pay to Seller any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount; provided, that no Event of Default exists hereunder, and provided further Purchaser, in its sole discretion and acting in good faith, has no concerns about Seller's ability to continue to perform its obligations hereunder.  Payment by Purchaser of said funds to Seller shall be made in accordance with any written instructions of Seller which are agreed to by Purchaser.

2.3.2 Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall.

2.3.3 Seller shall pay to Purchaser, on demand, the amount of any Reserve Shortfall.

2.3.4 Purchaser may (i) charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder; and (ii) pay any amounts due Seller hereunder by a credit to the Reserve Account.

2.3.5 Exposed Payments

2.3.5.1 Upon termination of this Agreement, Seller shall pay to Purchaser (or Purchaser may retain), to hold in a non-segregated non-interest bearing account the amount of all Exposed Payments (the "Preference Reserve").

2.3.5.2 Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays to the bankruptcy estate of the Account Debtor that made the Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code.

2.3.5.3 Purchaser shall refund to Seller from time to time that balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Account Debtor or otherwise.

2.3.5.4 Purchaser may retain the Reserve Account and/or Preference Reserve unless and until Seller has executed and delivered to Purchaser a general release (which shall be notarized if required by Purchaser) in the form contained on the final page of the Terms and Conditions.

2.4 Payments and Collections. Purchaser shall, for the purpose of the computation of fees due hereunder, add the Clearance Days to any Clearance Day Payments which is acknowledged by the parties to constitute an integral aspect of the pricing of Seller's facility to Purchaser, and shall apply irrespective of the characterization of whether receipts are owned by Purchaser or Seller. Should any check or item of payment not be honored when presented for payment, then payment shall be deemed not to have been made, and the fees shall be recalculated accordingly.

3. Fees. Seller shall pay to Purchaser, on demand, all fees and other amounts due hereunder, including but not limited to:

3.1 Documentation Fee. The Documentation Fee specified in the Factoring Master Agreement upon Purchaser's first purchase of Accounts.

3.2 Administrative Fee. The Administrative Fee immediately upon its accrual, calculated using the applicable Administrative Fee Percent specified in the Factoring Master Agreement as follows:

IF ADMINISTRATIVE FEE PERCENT IS NOT INDICATED AS "VARIABLE" OR "FLEXIBLE" IN THE FACTORING MASTER AGREEMENT, THE FOLLOWING PARAGRAPH 3.2.1 SHALL APPLY:

3.2.1 The Administrative Fee Percent specified in the Factoring Master Agreement.

IF ADMINISTRATIVE FEE PERCENT IS INDICATED AS "VARIABLE" OR "FLEXIBLE" IN THE FACTORING MASTER AGREEMENT, THEN WITH RESPECT TO THE REST OF THIS SECTION 3.2, THE FOLLOWING PARAGRAPHS 3.2.2 – 3.2.5 SHALL APPLY:

3.2.2 With respect to all Accounts purchased during the period from the first purchase of Accounts until the end of the month of purchase, and for the following full calendar month, the Administrative Fee Percent in the row designated as the Starting Tier in any fee table found in Exhibit A to the Factoring Master Agreement or otherwise incorporated into the Factoring Master Agreement.

3.2.3 Thereafter, and in each subsequent month, subject to paragraph 3.2.4, the Administrative Fee Percent in each row corresponding to the sum of the Face Value of all Accounts purchased in the prior calendar month. A resulting change (if any) to the Administrative Fee Percent shall not affect the Administrative Fee Percent that is in effect for previously Purchased Accounts.

3.2.4 Changes to the Administrative Fee Percent, when applicable, shall be made on or before the close of the fifth business day of each calendar month and shall apply to all subsequently purchased Accounts until a further change is applicable as provided in paragraph 3.2.3 and has been made. Notice to Seller of any change of the Administrative Fee Percent made in terms of this Agreement is not required.

3.2.5 Regardless of the prior calendar month's dollar volume of monthly Accounts purchased, if an Event of Default under the Agreement has occurred and is continuing without cure the Administrative Fee Percent may without notice be increased to the highest Administrative Fee Percent set forth in the fee table.

3.3 Service Charge. In connection with each Purchased Account, the Service Charge at the time each such Purchased Account is Closed, calculated using the Service Charge Percent specified in the Factoring Master Agreement as follows:

IF SERVICE CHARGE PERCENT IS NOT INDICATED AS "VARIABLE" OR "FLEXIBLE" IN THE FACTORING MASTER AGREEMENT, THE FOLLOWING PARAGRAPH 3.3.1 SHALL APPLY:

3.3.1 The Service Charge Percent specified in the Factoring Master Agreement.

IF SERVICE CHARGE PERCENT IS INDICATED AS "VARIABLE" OR "FLEXIBLE" IN THE FACTORING MASTER AGREEMENT, THEN WITH RESPECT TO THE REST OF THIS SECTION 3.3, THE FOLLOWING PARAGRAPHS 3.3.2 – 3.3.5 SHALL APPLY:

3.3.2 With respect to all Accounts purchased during the period from the first purchase of Accounts until the end of the month of purchase, and for the following full calendar month, the Service Charge Percent in the row designated as the Starting Tier in any fee table found in Exhibit A to the Factoring Master Agreement or otherwise incorporated into the Factoring Master Agreement.

3.3.3 Thereafter, and in each subsequent month, subject to paragraph 3.3.4, the Service Charge Percent in the row corresponding to the sum of the Face Value of all Accounts purchased in the prior calendar month. Any change to the Service Charge Percent made in terms hereof (if any) shall not affect the Service Charge Percent that is in effect for previously purchased Accounts.

3.3.4 Changes to the Service Charge Percent, when applicable, shall be made on or before the close of the fifth business day of each calendar month and shall apply to all subsequently purchased Accounts until a further change is applicable as provided in paragraph 3.3.3 and has been made. Notice to Seller of any change of the Service Charge Percent made in terms of this Agreement is not required.

3.3.5 Regardless of the prior calendar month's dollar volume of monthly Accounts purchased, if an Event of Default under the Agreement has occurred and is continuing without cure the Service Charge Percent may be increased to the highest Service Charge Percent set forth in the fee table.

3.4 Non-Recourse Credit Guarantee Fee. The Non-Recourse Credit Guarantee Fee specified in the Factoring Master Agreement, if applicable. The parties acknowledge that it is an integral part of the pricing that such Non-Recourse Credit Guarantee Fee shall apply to all Accounts purchased notwithstanding the fact that not all Accounts are purchased with a Non-Recourse Credit Guarantee.

3.5 Misdirected Payment Fee. Any Misdirected Payment Fee immediately upon its accrual.

3.6 Payment by Credit Card.  In the event an Account Debtor makes a payment to Purchaser using a credit card, Purchaser shall credit to the obligation of the Account Debtor the amount credited to Purchaser by Purchaser's credit card processor, net of any processing fees.

3.7 Minimum Monthly Fee. In any calendar month in which the sum of the Administrative Fee and the Service Charge earned on all Purchased Accounts is less than the Minimum Monthly Fee specified in the Factoring Master Agreement, the difference between the Minimum Monthly Fee and the sum of the Administrative Fee and the Service Charge earned on all Purchased Accounts in said calendar month shall be paid to Purchaser by Seller on the last day of said calendar month. The Minimum Monthly Fee shall be prorated for the initial month hereunder; provided, that there has not been an Event of Default.

3.8 Late Charge. The Late Charge on:

3.8.1 All past due amounts due from Seller to Purchaser hereunder; and

3.8.2 The amount of any Reserve Shortfall.

3.9 Out-Of-Pocket Expenses. The out-of-pocket expenses and allocated internal costs incurred by Purchaser in the administration of this Agreement and billed to Seller at Purchaser's normal and customary rates (including but not limited to such fees as may be stated in a listing or Schedule of "As Utilized Fees" issued by Purchaser from time to time), which includes re-documentation fees (minimum fee of $150 shall apply), wire transfer fees, invoice handling/postage fees, fees for handling of payments received by Purchaser on account of Seller that are not Purchased Accounts, and audit fees. At Purchaser's discretion, Seller shall pay for the cost of any filing (including UCC filings), or searching, or obtaining any public or other record.  In the event that Seller requires or requests that Purchaser enter into negotiations with a secured party of Seller in connection with the termination of this Agreement, or review or sign any agreement with or for the benefit of such secured party, Seller shall pay Purchaser out-of-pocket costs of its counsel and other advisors, as well as an hourly rate of $250.00 for the reasonable time of Purchaser's personnel spend in connection therewith (collectively the "Buyout Fee"). The Buyout Fee shall be in addition to the Termination Amount that may be due under section 13.2 hereof.

3.9.1 Buyout Fee and/or UCC Release /Termination fee. A minimum of seven hundred and fifty dollars ($750).

3.10 Underutilization Fee. Two hundred fifty dollars ($250) for each calendar month in which the sum of the Face Value of all Accounts purchased in said month is less than fifteen thousand dollars ($15,000).

3.11 Processing Fee. Twenty-five dollars ($25), in connection with each Accounts Transmittal listing Accounts totaling less than One Thousand Dollars ($1,000).

3.12 Non-Factored Account Processing Fee. At discretion of  Purchaser and without notice to Seller, a processing fee of 2.5% of the invoice amount for any non-factored invoice that is paid to Purchaser for account of Seller.

4. Repurchase of Accounts.

4.1 Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account, on demand, or at the Purchaser's option, by Purchaser's charge to the Reserve Account:

4.1.2 Any Purchased Account, including a Non-Recourse Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute.

4.1.3 Any Purchased Account including a Non-Recourse Account, regarding which Seller has breached any representation or warranty under this Agreement, or upon the occurrence of an Event of Default, or upon the termination date of this Agreement.

4.1.4 Any Purchased Account including a Non-Recourse Account, for which Seller fails to provide all original backup documentation (to include but not limited to invoices, delivery notices and properly signed bills of lading) relating to the unpaid Purchased Account, within 7 days of Purchaser's request.

4.1.5 Any Purchased Account (absent an Account Debtor becoming Insolvent within the Insolvency Period with respect to a Non-Recourse Account) where in Purchaser's reasonable judgment Account Debtor has indicated or demonstrated an unwillingness to pay the Purchased Account when due, or any portion of any Purchased Account which remains unpaid beyond either the Late Payment Date or the Late Invoice Date, as determined in the sole discretion of Purchaser.

4.1.6 All of the Purchased Accounts including Non-Recourse Accounts of any Account Debtor obligated thereon, in the event that greater than ten percent (10%) of Purchased Accounts due from that Account Debtor remain unpaid beyond either the Late Payment Date or the Late Invoice Date, as determined in the sole discretion of Purchaser.

4.2 The repurchase of a Purchased Account shall not constitute a reassignment of such Account, and a security interest therein shall remain in the Purchaser.

5. Repayment of Fuel Advance.  Purchaser may require Seller to repay any Fuel Advance, including any fees owed to Purchaser thereon, on demand, or at Purchaser's option, by charge to the Reserve Account, any Fuel Advance:

5.1 Made 5 days or greater from the date of said request for repayment, for which an original Invoice sufficient to evidence an Eligible Account has not been provided by Seller to Purchaser; or

5.2 That in the sole judgment of Purchaser does not represent an Account that will become an Eligible Account.

6. Security Interest. As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral.

7. Authorization to Purchaser.

7.1 Seller irrevocably authorizes Purchaser to exercise at any time, any of the following powers, at Seller's sole expense, until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all proceeds of any Collateral securing the Obligations or the proceeds thereof; (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the Collateral; (c) pay any sums necessary to discharge any lien or encumbrance which is, or may become senior to

Purchaser's security interest in any assets of Seller, which sums shall be included as Obligations and debited to the Reserve Account; (d) initiate electronic debit or credit entries through any electronic clearinghouse or other system for presentment including but not limited to Electronic Check Presentment, and ACH systems to or from the Depository, or any deposit (or other) account maintained by Seller wherever located; (e) file in the name of the Seller or Purchaser or both: Mechanic's Lien or related notices, and/or claims under any bond, in connection with goods or services sold or provided by Seller; (f) notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser; (g) communicate directly with Seller's Account Debtors to verify the amount and validity of any Account created by Seller; (h) after an Event of Default, change the address for delivery of mail (inclusive of Fedex, UPS or similar service) to Seller and to receive and open mail addressed to Seller; (i) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by any such Account Debtor), without affecting any of the Obligations; (j) disclose such information to third parties making credit inquiries about Seller as Purchaser deems necessary, including but not limited to any such inquiries made by credit reporting agencies.

7.2 Seller irrevocably authorizes Purchaser at any time and from time to time to file any initial financing statements and amendments thereto that: (a) indicate the Collateral as all assets of the Seller or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail, (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Seller is an organization, the type of organization, and any organization identification number issued to the Seller and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates; (c) contain a notification that the Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be tortiously interfering with Purchaser's rights, and advises third parties that any notification of Seller's Account Debtors will interfere with Purchaser's collection rights.

7.3 Purchaser shall not have any duties or obligations (implied or otherwise) except those expressly set forth in this Agreement. None of Purchaser, its officers, employees, agents or designees shall have, and Seller hereby releases and exculpates all of such persons and entities, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

7.4 Seller hereby gives its consent to Purchaser, without compensation or any other limitation, to publish or display testimonials or other statements from Seller and by any means in any media for Purchaser's advertising or promotional purposes.

7.5 Seller hereby gives its consent to Purchaser, without compensation or any other limitation, to share information about Seller including transactional data and information with nonaffiliated third parties for any purpose including marketing to Seller of special offers and trade discounts.

7.6 Seller hereby ratifies its authorization to Purchaser to file, prior to the date hereof, any initial financing statements or amendments which indicates the Collateral as all assets of the Seller or words of similar effect.

7.7 Seller hereby grants Purchaser the limited power of attorney to (a) correct and/or execute or initial all typographical or clerical errors discovered in any of the documents executed by Seller in connection herewith, (b) make, amend or correct any filing required by the Federal Motor Carrier Safety Administration or any governmental agency having jurisdiction over Seller, including but not limited to the correction of inconsistent names under which Seller is listed, (c) file or advertise fictitious names for the Seller in the name of and at the cost of Seller, including doing so through the use of a third-party vendor such as www.mycorporation.com, (d) prepare and sign, on behalf of Seller, notice of assignment of all of Seller's Accounts to Purchaser, said notice to be provided to any Account Debtor of Seller at Purchaser's sole discretion, and (e) prepare and sign, on behalf of Seller, authorization documentation necessary to enroll Seller for any applicable fuel program facilitated by Purchaser with any third party at Purchaser's sole discretion.  In the event that Purchaser corrects and/or executes or initials any errors in accordance with this Section 7.7, Purchaser will send Seller a copy of the document so executed or initialed on Seller's behalf; provided, that failure to do so shall not invalidate the correction.

7.8 Seller hereby acknowledges and agrees that Purchaser shall have no obligation to rescind any notice(s) of assignment provided to any Account Debtor of Seller while any Obligations, including any loan or working capital advance, remain unpaid.

8. Covenants by Seller.

8.1 After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not (a) grant any extension of time for payment of any of its Accounts, (b) compromise or settle its Accounts for less than the full amount thereof, (c) release in whole or in part any Account Debtor, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

8.2 From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request.  Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer

equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

8.3 Before sending any Invoice to an Account Debtor, Seller shall mark same with a notice of assignment as may be required by Purchaser.

8.4 Seller shall pay when due all payroll and other taxes and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

8.5 Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any assets in which Purchaser now or hereafter holds a security interest.

8.6 Seller shall maintain surety bonds and all insurances required by law to operate its business, as well as insurances on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in the amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) lender loss payable endorsements naming Purchaser as loss payee, in form and substance satisfactory to Purchaser; and (c) at least annually and at such other times as reasonably requested by Purchaser, certificates of insurance from Insurance companies showing Purchaser as loss payee. All policies of insurance shall provide for not less than thirty (30) days prior written cancellation notice to Purchaser

8.7 Notwithstanding Seller's obligation to pay the Misdirected Payment Fee pursuant to Section 3.5 hereof, Seller shall pay the amount of any payment on account of a Purchased Account received by Seller to Purchaser on the next banking day following the date of receipt thereof by Seller.

8.8 Seller shall not, without Purchaser's prior written consent, enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

8.9 Seller shall not, without Purchaser's prior written consent, have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity.

8.10 For the duration of this Agreement, Seller shall, by the third business day of each month, provide Purchaser with (i) Seller's current customer list, including customer name, email address, mailing address, phone number and contact person, and (ii) Seller's updated accounts receivable aging.

8.11 For the duration of this Agreement, Seller agrees that it shall not undertake any other financing or sell its future receivables to any entity other than Purchaser or Purchaser's Affiliates without the express written consent of Purchaser and hereby acknowledges that such action may constitute a material dilution of Purchaser's interest in the Collateral. In the event that Seller breaches this covenant, Seller shall pay to Purchaser the sum of ten percent (10%) of the financing received without Purchaser's consent, in addition to any other remedies available to Purchaser under this Agreement.

8.12 Upon execution of this Agreement, Seller shall, if requested by Purchaser, deliver to Purchaser an executed Confession of Judgment (the "Confession of Judgment"), in the form provided by Purchaser, in favor of Purchaser in the amount of the outstanding Obligations.

9. Account Disputes. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms, as Purchaser in its sole discretion deems advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default Purchaser may Resolve such issues with respect to any Account of Seller.

10. Avoidance Claims. IF THE NON-RECOURSE CREDIT GUARANTEE FEE IS "ACCEPTED" OR "INCLUDED" ON THE FACTORING MASTER AGREEMENT, THEN WITH RESPECT TO THE REST OF THIS SECTION 10, THE PARAGRAPHS 10.1, 10.3 AND 10.4 SHALL APPLY:

10.1 Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim other than such claims that relate to Purchased Accounts that are owed by an Account Debtor which was Insolvent and shall pay to Purchaser on demand the amount thereof. IF NON-RECOURSE CREDIT GUARANTEE FEE IS "DECLINED" ON THE FACTORING MASTER AGREEMENT, THEN WITH RESPECT TO THE REST OF THIS SECTION 10, THE FOLLOWING PARAGRAPHS 10.2-10.4 SHALL APPLY:

10.2 Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim and shall pay to Purchaser on demand the amount thereof.

10.3 Seller shall notify Purchaser within two (2) business days of it becoming aware of the assertion of an Avoidance Claim.

10.4 This provision shall survive termination of this Agreement.

11. Representation and Warranty. Seller represents and warrants that:

11.1 It is fully authorized to enter into this Agreement and to perform hereunder;

11.2 This Agreement constitutes its legal, valid and binding obligation;

11.3 Seller is solvent and in good standing in the State of its organization;

11.4 Seller has not received notice or otherwise learned of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased Accounts;

11.5 Its financial statements, if provided to Purchaser, and any financial statements furnished to Purchaser hereafter, fairly represent the financial condition of Seller and each Guarantor at such dates, and since those dates there has been no material adverse change, financial or otherwise, in such condition or in the operation or ownership of Seller.  Regardless of whether financial statements were provided to Purchaser, Seller has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation or ownership. Purchaser shall require bank login access, or bank statements if online access is unavailable, to any bank account maintained by Seller or Affiliate of Seller at any time during the performance of this Agreement and the Seller shall provide them to Purchaser within three (3) business days of Purchaser's request.  Seller's failure to do so will constitute a material breach of this Agreement.

11.6 The Purchased Accounts are and will remain:

11.6.1 Bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business and are not sales to any entity that is an Affiliate of Seller or in any way not an "arm's length" transaction.

11.6.2 Unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation other than, with respect to a Non-Recourse Account, Accounts owed by an Account Debtor which was Insolvent.

12. Default.

12.1 Events of Default.  The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, including with Purchaser's Affiliates and any third party servicers, or any warranty or representation made at any time by Seller to Purchaser, including to Purchaser's Affiliates and any third party servicers, proves to be false in any way, however minor, (b) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations, (e) failure of Seller or any guarantor to notify Purchaser in writing at least thirty (30) days prior to changing its name, jurisdiction of organization, organizational structure, or incorporating or otherwise initiating a new business substantially similar in ownership or operation (including a transportation brokerage) to that of Seller, (f) a change of twenty (20%) or more in the direct or indirect capital ownership of the Seller, (g) Seller suspends or discontinues its business as conducted on the date hereof for any reason, or at any time Seller has not submitted Accounts to Purchaser for purchase

for a period of ninety (90) days or (h) Seller enables or permits any third party to directly or indirectly access any information contained in those areas of Purchaser's website or account portal which are accessible with the use of a password provided to Seller by Purchaser, including but not limited to any access to printouts, or paper or electronic copies of such information from Purchaser's website.

12.2 Effect of Default. Upon the occurrence of any Event of Default, (a) the Default Rate shall accrue and is payable on all Obligations, and in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice, and (b) any fees due hereunder and previously waived by Purchaser shall be automatically reinstated, all such fees having been waived on the condition that no Event of Default was existing or shall thereafter occur. Further, upon the occurrence of any Event of Default or after the giving of any notice of termination pursuant to Section 13 hereof, Purchaser may in its sole discretion, deny Seller access to any remotely accessed reporting or credit system (including any online or telephone systems or account portal) that may be maintained by Purchaser. Upon the waiver by Purchaser of any Event of Default hereunder, Seller shall pay Purchaser a default waiver fee equal to ten percent (10%) of the then existing Receivable Finance Facility. Any failure by Purchaser to assess such default waiver fee immediately upon the occurrence of an Event of Default shall not be deemed a waiver by Purchaser to charge such fee.

12.3 Waiver of Notice. SELLER WAIVES ANY REQUIREMENT THAT PURCHASER INFORM SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLER'S OBLIGATIONS HEREUNDER. FURTHER, PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR ANY FEES DUE HEREUNDER SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO

13. Termination. This Agreement will be effective on the Closing Date and will continue in full force and effect until Purchaser has released its lien in accordance with paragraph 16 hereof.

An initial Term equal to the Relationship Period shall apply. Seller understands and agrees that this Agreement is ineligible for termination within the Relationship Period.

At the end of any Term, unless (a) notice to terminate is given within the subsequent 30 days ("30-day Notice Window") and (b) full payment of all outstanding Obligations has been made by Seller to Purchaser within the Notice Window, this Agreement shall be extended automatically for "Subsequent Term/s" which shall each comprise a 12-month period (unless otherwise agreed in writing) followed by a Notice Window.

At the end of the Relationship Period or of any Term, Seller may give notice to terminate this agreement without incurring an early termination fee provided such notice is given within a 30-day Notice Window. If no such notice is given, this Agreement shall be automatically extended for a Subsequent Term. It is agreed that during and after any Notice Window this Agreement shall continue to be in full force and effect until Purchaser releases its lien in accordance with paragraph 16 hereof.

13.1 Any notice to terminate this Agreement by Seller must be given either by a) email to Purchaser sent to: contracts@ecapital.com or b) by mail addressed to: eCapital Freight Factoring Corp., Att: Contracts Department, at 20807 Biscayne Blvd #203, Aventura, FL 33180. Termination notices sent by any other method or to any other email address will be deemed invalid.

13.2 Early Termination. Seller shall also have the option at any time that is not during a Notice Window, and upon thirty (30) days prior written notice to Purchaser, to terminate this Agreement by paying to Purchaser in cash the amount of the outstanding Obligations. In such case, at the time of said early termination, Seller shall also pay to Purchaser an early termination fee not to exceed ten percent (10%) of the then existing Receivable Finance Facility, as increased in accordance with Section 2.1.5 hereof, as well as any unpaid Minimum Monthly Fee(s) for the remaining months of the Agreement. (collectively the "Termination Amount").

In the event of early termination by Seller as aforesaid, the Service Charge Fee due on all unpaid Accounts shall be calculated based on the Account being Closed on the Late Payment Date.

Notwithstanding any other provision of this Agreement, Seller shall pay to Purchaser Buyout Fees and/or UCC Termination Fees as may be due under section 3.9.1 hereof.

13.3 Purchaser may terminate this Agreement without notice following the occurrence of an Event of Default, after which event Seller shall pay to Purchaser the Termination Amount.

13.4 Any payments received by Purchaser from any Account Debtor following the termination of this Agreement may be, at Purchaser's option, (a) applied to repay any outstanding Obligations hereunder, (b) forwarded to Seller, or (c) returned to such Account Debtor.  Notwithstanding the foregoing, Purchaser (i) shall not bear any responsibility or liability with respect to any such payments, and (ii) may retain 2.5% of the amount of any such payments received to cover Purchaser's costs of handling such payments.

14. Account Stated. Purchaser shall render to Seller, from time to time, a statement by email or online setting forth the transactions arising hereunder.  Each statement shall be considered correct and binding upon Seller as an Account Stated, except to the extent that Purchaser receives, within thirty (30) days after providing such statement, written notice from Seller of any specific exceptions by Seller to that statement, whereafter it shall be binding against Seller as to any items to which it has not objected.

15. Amendment. PURCHASER RESERVES THE RIGHT TO AMEND THESE TERMS AND CONDITIONS at any time, and from time to time, by publishing a revised version of the Terms and Conditions at the following site, www.terms.eCapital.com. Seller's submission of Accounts to Purchaser for purchase following the posting of any such amendments to the Terms and Conditions constitutes Seller's acceptance of those revisions, and Purchaser has no obligation to inform Seller of such changes in any other manner.  Further, if an increase in either the Libor Rate or the Prime Rate over that paid by Purchaser at the Closing Date raises the Purchaser's cost of borrowing, then in such event, Purchaser may immediately increase the Fees (including the Administrative Fee and Service Charge) then charged to Seller so as to recoup Purchaser's increased costs of borrowing with respect to subsequently Purchased Accounts. No failure to

exercise and no delay in exercising any right hereunder shall impair any such right that Purchaser may have, nor shall any waiver by Purchaser hereunder be deemed a waiver of any default or breach subsequently occurring. Purchaser's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have.

16. No Lien Termination without Release. In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release (which shall be notarized if required by Purchaser) in the form contained on the final page of the Terms and Conditions. Seller understands that this provision constitutes a waiver of its rights under §9-513 of the UCC. Seller shall pay to Purchaser any fees that may be due under section 3.9.1 of this Agreement.

17. Attorneys' Fees. Seller agrees to reimburse Purchaser on demand for:

17.1 The actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith;

17.2 The actual costs, including photocopying, travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party;

17.3 Either (the choice of which shall be in the sole discretion of Purchaser):

17.3.1 The actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (a) arising out of the automatic stay, (b) seeking dismissal or conversion of the bankruptcy proceeding or (c) opposing confirmation of Seller's plan thereunder, and protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims.

17.3.2 Twenty percent (20%) of the amount of the claim of Purchaser against Seller, which Seller agrees shall constitute a reasonable substitute for such actual fees and expenses.

18. Reaffirmation of Finance Application. To induce Purchaser to enter into this Agreement, Seller hereby ratifies and affirms all representations and warranties it made in the Finance Application.

19. Entire Agreement. This Agreement supersedes all prior agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

20. Jury Trial Waiver. IN RECOGNITION OF THE HIGHER COSTS AND DELAYS WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING HEREUNDER, OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY; AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHTS TO TRIAL BY JURY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

21. Arbitration of all Disputes and Claims.

21.1  In order to gain the benefits of a speedy, impartial and cost-effective dispute procedure, and for good and valid consideration as covenanted herein, and intending to be legally bound, Purchaser, Seller and Guarantor(s) hereby agree that, except as otherwise provided herein, at the election of any party by notice to the other parties, all disputes and claims for which a court otherwise would be authorized by law to grant relief, in any manner, that Seller and/or Guarantor(s) may have, now or in the future, of any and every kind of nature whatsoever with or against Purchaser or Purchaser's Affiliates or any third party servicer, shall be submitted to the American Arbitration Association ("AAA") to be resolved and determined through final and binding arbitration according to the Commercial Arbitration Rules of the AAA. This Section 21 is a material inducement for Purchaser to enter into this Agreement.

21.2  Each party shall have the right to representation by counsel with respect to arbitration of any dispute arising out of or related to this Agreement.  Except as prohibited by law, at the request of any party, the arbitration proceedings shall be conducted in confidence, and, in such a case, all documents, testimony, and records shall be received, heard, and maintained by the arbitrator in confidence, available for inspection only by the parties, their respective attorneys, and experts, who shall agree, in advance and in writing, to receive all such information confidentially and to maintain the secrecy of such information until it shall become generally known. The parties shall be allowed adequate discovery as part of the arbitration process, including reasonable  access to essential documents and witnesses as determined by agreement or the arbitrator.

21.3 Unless the parties agree otherwise, any arbitration hearings shall take place in Miami-Dade County, Florida. If the claim against Purchaser or Seller is for $100,000 or less, the parties agree the arbitration will be conducted solely on the basis of the documents submitted to the arbitrator, through a telephonic hearing. If the claim exceeds $100,000, unless the parties agree otherwise, the arbitration will be conducted by an in-person hearing.  If the arbitration is conducted by an in-person hearing, the arbitrator shall conduct a full hearing as to all issues and disputes not resolved by dispositive motion. At such hearing, the parties shall be entitled to present evidence and examine and cross-examine witnesses. The arbitrator shall issue a written decision revealing the essential findings and conclusions upon which any award is based.  In addition, except as otherwise specified herein, the arbitrator shall have the authority to award equitable relief, and damages, including, but not limited to, any remedy or relief that a governing court might order.

21.4 The parties agree that any arbitration award rendered as the result of any arbitration under this Agreement shall be final and binding, and judgment on the award may be entered and enforced in any court having jurisdiction thereof.

21.5 The parties agree that this Agreement, any arbitration under this Agreement, and any arbitration award rendered in such arbitration shall be governed by the Federal Arbitration Act. The parties further agree that any issues as to arbitrability of a dispute, including but not limited to this Section 21, shall be resolved and decided by the arbitrator. All statutes of limitations which would be applicable to a judicial proceeding shall be applicable to an arbitration proceeding under this Agreement.

21.6 With respect to all costs and fees of the arbitration, the parties agree that each party shall bear its own costs and fees, including witness fees and attorneys' fees, and that each party shall bear an equal share of the arbitrator's fees.  The arbitrator shall award to the prevailing party in the arbitration all of their costs and fees of the arbitration, including witness and attorneys' fees.

21.7 Nothing in this Section 21 shall limit the right of a party (i) to exercise self-help remedies available under this Agreement, including, without limitation, setoff or exercising its rights under the UCC, or (ii) to obtain from a court provisional or ancillary remedies such as, but not limited to, injunctive relief, specific performance, attachment, or the appointment of a receiver from a court having jurisdiction before, during, or after the pendency of any arbitration proceeding. The pursuit of provisional or ancillary remedies or exercise of self-help remedies shall not constitute a waiver of the right of any party to submit such dispute or claim to arbitration.

21.8 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY  CLAIM AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW  AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES CLASS HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTAILED TO RECOVER ATTORNEYS FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISIONS IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A

MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

22. Covenant Not to Sue.

22.1 Seller and Guarantor(s) agree that they will never institute, prosecute or in any way aid in the institution or prosecution of any claim, demand, action or cause of action at law or in equity against the Purchaser, Purchaser's Affiliates or any third party servicer for a claim of usury, a claim that that the Purchaser is required to have any lending license, or any other claim contending that the Purchase Price paid by the Purchaser in exchange for the Purchased Accounts is, or should be construed as, a loan from the Purchaser to the Seller.  Nothing in this Section 22 is intended to prevent Seller or Guarantor from complying with any lawfully issued subpoena or court ordered discovery.

22.2 This Section 22 is a covenant not to sue, and not a release.  In the event that the Seller or any Guarantor breaches or in any way violates the terms of this Section 22 the Sellers and Guarantors jointly and severally agree to indemnify the Purchaser for all damages arising from that breach, including without limitation the payment of all costs and expenses of every kind for the enforcement of Purchaser's rights and remedies under this section, including any and all attorneys' fees and costs in any trial court or appellate court proceeding, any administrative proceeding, any arbitration or mediation, or any negotiations or consultations in connection with breach of this section 22.

22.3 This covenant shall inure to the benefit of Purchaser, Purchaser's Affiliates and any third party servicers, and shall bind Seller, Guarantor(s) and their respective successors and/or assigns, any of their respective affiliated or subsidiary companies, partners, owners, joint ventures, and/or any of Seller's managers, directors, officers, employers or agents.

23. No Liability for Special Damages.

23.1 Purchaser may from time to time promote or provide to Seller the products or services of third parties, such as (but not limited to) fuel cards, fuel discounts, insurance, and roadside services, ("the Services'). The Seller acknowledges and agrees that the Purchaser is acting as a facilitator in the provision of the Services and does not provide any guaranty or warranty of performance by itself or by such third party. Seller hereby indemnifies Purchaser against any claim it may have arising out of the provision of the Services.

23.2 In no event (including but not limited to any claim under 23.1) will Purchaser be liable for any claims asserted by  Seller under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Seller and each Guarantor.

24. Indemnified Amounts.  Upon the occurrence of an Event of Default, except as otherwise provided in Section 21, Seller and Guarantor(s), jointly and severally, shall assume liability for and do hereby agree to indemnify, protect, save and keep harmless Purchaser, Purchaser's Affiliates, and any third party servicers from and against any and all liabilities, claims, losses,

obligations, damages, penalties, actions and suits of whatsoever kind and nature imposed on, incurred by or asserted against Purchaser, Purchaser's Affiliates or any third party servicers, in any way relating to or growing out of such Event of Default (collectively, "Indemnified Amounts"), including without limitation the payment of all costs and expense of every kind for the enforcement of Purchaser's rights and remedies hereunder and/or the collection of amounts due to Purchaser hereunder, including attorneys' fees and costs in any trial court or appellate court proceeding, any administrative proceeding, any arbitration or mediation, or any negotiations or consultations in connection with any Event of Default. Such Indemnified Amounts shall bear interest at the highest rate of interest allowed by applicable law until paid.

25. Notice. All notices required to be given to Purchaser, except as specified in paragraph 13.1 (notice of termination), shall be sent to: 20807 Biscayne Blvd #203, Aventura, FL 33180 ; Attn: The General Manager; and if to Seller, at the address, fax number or email address furnished on the Finance Application or Factoring Master Agreement, or to such other addresses as each such party may in writing hereafter indicate.

26. Mechanic's Lien. Where applicable, Seller hereby agrees at Purchaser's request to file a Notice of Mechanic's Lien on any real property improvement upon which it has performed labor or furnished materials, the Account for which labor and/or materials it has assigned to Purchaser. In the event Seller fails to promptly comply with such request, Seller does hereby constitute and appoint Purchaser as its agent to execute and file in the name of Seller a Notice of Mechanic's Lien to the extent of the debt due from the Account Debtor for and on account of such labor and material. In connection with the filing of such Notice of Mechanic's Lien, the Seller agrees to periodically advise the Purchaser of the amount or amounts owed by the Account Debtor in connection with each real improvement so that the Notice of Mechanic's Lien will be accurate in all respects. Seller further agrees not to provide the Account Debtor with a "Waiver of Right to File a Notice of Mechanic's Lien" without the prior written consent of Purchaser.

27. Conflict. Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

28. Severability. In the event anyone or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provisions shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

29. Relationship of Parties. The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and Purchaser shall not be a fiduciary of the Seller, although Seller may be a fiduciary of the Purchaser. Purchaser may, at Purchaser's option, contract with one or more third parties chosen by Purchaser, including but not limited to Capital Partners Services, to perform all or part of Purchaser's duties hereunder.

30. Service of Process. Seller agrees that Purchaser may effect service of process upon Seller by regular mail at the address for notices set forth in section 25 of this Agreement, or at the option of Purchaser, if Seller is a Registered Organization, by service upon Seller's agent for the service of process.

31. Successors and Assigns.

31.1 This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

31.2 Purchaser may assign its rights and delegate its duties hereunder. Upon such assignment, Seller shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Purchaser. Such assignment shall constitute a novation whereby Seller shall agree that the assignee assumes Purchaser's obligations under this Agreement and Purchaser is released from further liability under this Agreement. Seller may not assign its rights or delegate its duties hereunder, without Purchaser's prior written consent.

32. Choice of Law and Venue. This Agreement and all transactions or disputes arising directly or indirectly hereunder shall be governed by, construed under and enforced in accordance with the internal laws of the State of Florida. Subject to the mandatory arbitration requirements set forth in Section 21, and all subsections thereto, any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement shall, if Purchaser so elects, be instituted in the United States District Court for the Southern District of Florida, the Eleventh Judicial Circuit Court of Florida, or any other judicial forum located in the state of Florida (the "Acceptable Forums"). Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Florida or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

FORM OF GENERAL RELEASE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits eCapital Freight Factoring Corp. ("Releasee"), its parent, affiliates, subsidiaries, directors, shareholders, agents, contractors and employees, of and from any and all claims, demands, obligations, liabilities, indebtedness, breaches of contract, breaches of duty of any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses (collectively "Claims"), of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name,

whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, to the extent that they arise out of or are in way connected to or are related to Releasor's factoring relationship with Releasee.

Releasor agrees that the matters released herein are not limited to matters which are known or disclosed, and the Releasor waives any and all rights and benefits which it now has, or in the future may have, conferred upon it by virtue of the provisions of the laws of any state that may impose a limit or limits on the extent to which a general release may exclude matters which are not known by or disclosed to Releasor.

Releasor acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and it acknowledges that this Release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to release, discharge and acquit the Releasee from any such unknown Claims.